## TATEM MANUFACTURING COMPANY
### v.
### The UNITED STATES.
### No. Cong. 4–58 *.

United States Court of Claims.
Nov. 9, 1967.

John W. Kline, New Haven, Conn., attorney of record, for plaintiff.

Edward Weintraub, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on August 29, 1967. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the Rules of the court has expired. On October 6, 1967, defend-

---

* The petition in the instant case was filed on August 7, 1958, prior to the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). The court deems it proper to file this report at this time without reference to the Supreme Court's opinions in the latter case or to the recent Congressional Reference Act, Public Law No. 89–681, 89th Congress, 2nd Session, October 15, 1966, 80 Stat. 958, because, although filed as a Congressional Reference Case, the petition also seeks judgment under the general jurisdiction of the court and the court alone can dispose of that part of the petition.

ant filed a motion that the court adopt the commissioner's report to which plaintiff has failed to respond. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiff is, therefore, not entitled to recover on the petition insofar as it asserts a claim under the general jurisdiction of this court and, as such, the petition is dismissed. It is further concluded that plaintiff has not stated a claim either legal or equitable against the United States and this opinion and the findings, so concluding, will be reported and certified by the Clerk to Congress pursuant to House Resolution 519, 85th Congress, 2nd Session.

## OPINION OF COMMISSIONER **

GAMER, Commissioner:

This is another claim by a subcontractor-creditor of Harvey-Whipple, Inc., a defunct former Government prime contractor, for losses suffered by reason of unpaid invoices and unused inventory. As was the situation with another subcontractor, Meriden Industries Company, No.Cong. 5–58 (Meriden Industries Company v. United States, Ct.Cl., 386 F.2d 885) (Report of Commissioner to the Court, filed July 28, 1967), plaintiff also sought relief from Congress, and the bill that was introduced on its behalf (H.R. 6358, 85th Congress, 1st Session) was, by House Resolution 519, 85th Congress, 2d Session, referred to this court for a report as to the legal and equitable nature and character of its claim (the same resolution also referring to the court the bill that had been introduced for the relief of Meriden Industries Company).

As with Meriden, Harvey-Whipple's admitted indebtedness to plaintiff was included as a part of Harvey-Whipple's own Congressional Reference claim, and plaintiff's request that its case be suspended pending the final determination of Harvey-Whipple's suit was, because of such overlapping, likewise granted by the court. For the same reasons set forth in *Meriden Industries*, however, it became necessary, after the disposition of Harvey-Whipple's case (Harvey-Whipple, Inc. v. United States, (342 F.2d 48, 169 Ct.Cl. 689 (1965)), to proceed with an independent determination of plaintiff's claim.

Plaintiff contends that defendant is legally liable to it, for which liability the court should enter judgment under its general jurisdiction. Furthermore, it urges the court, should it conclude that there is no such legal liability, to recommend to the Congress that it is entitled, on equitable grounds, to relief.

Here too the basis for legal liability is an alleged contract implied in fact.[1] It is concluded, however, that there is no more reason for finding such an implied contract here than there was in *Meriden Industries*.

Unlike Meriden, who, as a subcontractor, was associated with the Harvey-Whipple project from its inception in 1952, plaintiff did not enter into the picture until 1955, just a few months before Harvey-Whipple permanently suspended operations. Although Harvey-Whipple's financial condition and credit rating were already poor in 1952 when Meriden decided to risk manufacturing and shipping certain components of the "Combination Intrenching Tool" that Harvey-Whipple had contracted to manufacture for the Army, such condition

---

** The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

1. 28 U.S.C. § 1491 (1964 ed.) vests the court with jurisdiction to render judgment upon any claim arising from an "express or implied contract with the United States." However, this authorization is the basis for finding liability only on a contract implied in fact, and not one implied in law. J. C. Pitman & Sons, Inc. v. United States, 317 F.2d 366, 161 Ct.Cl. 701 (1963).

steadily worsened.[2] By the time plaintiff decided to become a subcontractor around March 1955, Harvey-Whipple was badly insolvent. Through the usual trade channels plaintiff well knew of Harvey-Whipple's serious financial condition when it too decided to risk becoming its subcontractor.

Plaintiff hase been engaged for many years in the manufacture of all types of wood handles, as well as certain parts for the textile industry. One of the essential components of the Combination Intrenching Tool (a folding pick and shovel) that Harvey-Whipple was manufacturing was a hickory handle. When Harvey-Whipple was awarded the contracts in 1952 for the manufacture of over 1,000,000 of these tools for the Army, plaintiff had submitted a bid to Harvey-Whipple to supply the handles. However, another company, Northern Handle Mills, Inc., received and accepted the subcontract despite its knowledge (ascertained when it found it was unable to obtain bank financing for the subcontract) of Harvey-Whipple's poor credit standing.

As did the other subcontractors and suppliers, Northern continually experienced difficulty in obtaining payment for its shipments. Both the *Harvey-Whipple* and *Meriden Industries* opinions and findings detail the frequent suspensions in Harvey-Whipple's contract work and its constant financial distress, despite the fact that it had received a Reconstruction Finance Corporation loan to aid it in performing the contracts. In April 1954, a creditors' committee had been set up. Meriden had several times suspended shipments of the component parts it was manufacturing because of nonpayment of its bills, which in turn made it impossible for Harvey-Whipple to assemble and ship completed tools to the Army. In early 1955 Northern finally refused to ship further handles

and terminated its association with Harvey-Whipple. Thereupon, Harvey-Whipple found it necessary to obtain another handle supplier, and around early February 1955 approached plaintiff.

At that time, plaintiff was in dire need of new business. The part of its operation that was related to the textile industry was in a serious slump. Plaintiff had suffered losses for the two previous years. However, plaintiff is a relatively small company and before undertaking the obligations incident to the production called for by the proposed subcontract, it checked with its bank and the usual trade credit channels. The resulting reports concerning Harvey-Whipple were adverse and plaintiff consequently decided to forego this source of new business.

It so happened that this particular period was an unusually turbulent one in Harvey-Whipple's existence. Its contracts fixed (after numerous previous extensions) January 15, 1955 as the final delivery date. However, as of such date, it was in default in the large amount of over 410,000 tools. It (and Meriden, its principal subcontractor) simply had been unable to produce in the large-scale quantities called for by the contracts. The future of the contracts, i. e., whether the Army would again readjust and extend the delivery schedule, as Harvey-Whipple was strongly urging, or would terminate for default, was in doubt.

Harvey-Whipple's most serious problem was its weak financial condition. It was unable to finance the type of large-scale production envisioned by the contracts. It had no source of substantial funds or financing other than the RFC loan. However, this loan, upon which it was completely dependent, far from solved its financial problem. All of its plant and properties were already pledged to the RFC as security for a previous loan, on which a large balance was still

---

**2.** Harvey-Whipple entered into the Army contracts in May 1952, but large-scale production did not commence until 1953. On its overall corporate operations (the company's principal business was man- ufacturing and distributing heating equipment and related articles) it lost over $147,000 in 1952, over $217,000 in 1953, and over $181,000 in 1954.

due when the second loan was granted to aid it in performing these Army tool contracts, and the additional security for such second loan was the receipts to become due from the Army under the contracts. The arrangement between RFC and Harvey-Whipple was that, after an initial loan advance for the capital investment required to set up its assembly line,[3] further advances would be made only against receipts from the Army, which were assigned to the RFC. Since it was known that, as a practical matter, Harvey-Whipple had no funds of its own or any other source of funds with which to finance the contracts, RFC released the bulk of the assigned Army payment checks to Harvey-Whipple, retaining only a small balance for required interest and principal applications. (Throughout the life of the contracts, RFC released to Harvey-Whipple approximately $860,-000, constituting 86 percent of the funds it received from the Army.)

However, the release of funds to Harvey-Whipple at any time was within RFC's discretion. Releases were made only upon applications by Harvey-Whipple, with supporting data relating to its financial condition, the status of the contracts, the intended use of the loan funds requested, etc. If, in RFC's judgment there was, since the last loan advance, such an "adverse change" in the borrower's financial condition as to threaten its ability to repay, honoring the release request was precluded. In such a situation only the RFC Board of Directors (or later the Administrator or comparable official) could specially authorize the making of further advances. Harvey-Whipple's being in default on the Army contracts was considered such an "adverse change" since a termination of the contracts would cut off an important source of Harvey-Whipple income, stop the only way Harvey-Whipple had to repay the RFC loan, and possibly expose it to severe penalties. Accordingly, Harvey-Whipple contract defaults, which were frequent, were often accompanied

by cessation of further RFC financing. Since this was Harvey-Whipple's only source of funds, creditors went unpaid during such periods.

Indeed, since Harvey-Whipple had no funds of its own, subcontractors and suppliers customarily had to wait for the RFC releases before they could be paid anything. If there were no RFC fund releases, their debts would mount. In addition, if Harvey-Whipple production difficulties prevented shipments of completed tools (there were, for instance, frequent bottlenecks caused by unbalanced component shipments) no Army funds at all would be generated for subsequent RFC release. Furthermore, even though releases were made, they frequently proved to be insufficient to satisfy the full amounts of the outstanding indebtednesses.

Although there had been several extensions by the Army of the delivery schedules, thus relieving Harvey-Whipple of the default situations into which it frequently fell and enabling the continuance of RFC financing, nevertheless in the months prior to the final January 15, 1955 delivery date Harvey-Whipple's delinquency again began to mount. However, the Army took no default action at that time, allowing Harvey-Whipple to deliver whatever tools it could, and despite such contract default situation, RFC, by special Administrator authorization, permitted fund releases against such shipments to continue.

When the final contract date arrived in January 1955, Harvey-Whipple, as it had frequently done in the past, urged the Army to permit the contracts to continue and again to extend the delivery schedules. It stated that a group of qualified and financially responsible businessmen was considering taking over Harvey-Whipple (which was, as stated, then insolvent, having suffered a 1954 loss of over $181,000, the fourth straight year of losses totaling over $573,000) and, as consideration for a time extension,

3. Harvey-Whipple had subcontracted the manufacture of all the components of the tool. It itself was to do only the assembling, painting, packing, and shipping.

offered a reduction in the price of the remaining tools to be delivered and the withdrawal of certain claims it was making. On February 9, however, Harvey-Whipple advised the Army that its reorganization plans had not materialized. The following day, February 10, the contracting officer served it with notices of default on its contracts and gave it 10 days within which to demonstrate its capability of effecting substantial deliveries within 30 days and to furnish evidence that it could secure adequate financing. On February 16, Harvey-Whipple requested a conference with the Army, and one was arranged for February 24.

This was the precarious situation in which Harvey-Whipple was at the time it lost Northern as its handle supplier and approached plaintiff. At that time, with the notices of default outstanding, it did not even know whether there would be any Army contracts at all upon which plaintiff could function as a subcontractor. Yet, without a handle supplier, it surely would not be able to convince the Army at the forthcoming conference of its capability of completing the contracts. Furthermore, despite the final contract delivery date of January 15, it went right ahead assembling and shipping tools, and the Army continued to accept them. Indeed, its shipping performance in February showed considerable improvement. Prior to the meeting planned for February 24, it made two shipments on February 8, another on February 15, and another on February 21. RFC received almost $80,000 from the Army on these shipments, and released to Harvey-Whipple almost $64,000, enabling Harvey-Whipple to pay its subcontractors during this period in accordance with a 14-day arrangement, i. e., Harvey-Whipple would assemble their components within a week of receipt, and ship completed tools and receive the RFC release of founds with respect thereto, in another week.

After plaintiff received from its bank and trade channels the above-mentioned adverse reports about Harvey-Whipple, its Treasurer, Kenneth Walker, advised Harvey-Whipple that plaintiff had decided not to enter into the subcontract due to Harvey-Whipple's poor financial condition and credit rating. However, with characteristic tenacity and persuasiveness, Harvey-Whipple urged plaintiff to reconsider. It described its RFC loan and the procedures thereunder, stating that if plaintiff would be willing to ship on open account, payment would be made in 14 days, as Harvey-Whipple was then currently paying the other subcontractors. This interested Walker. As noted, plaintiff needed the business badly. On February 15, 1955, he telephoned Harvey-Whipple and asked it to send a confirmatory letter describing Harvey-Whipple's arrangement with RFC and the proposed method of paying plaintiff's invoices should it decide to undertake the subcontract. Further, Walker that day also dispatched a letter to the Defense Lending Division (DLD) of the Treasury Department which by that time had taken over the functions of the RFC. The letter stated that plaintiff was negotiating with Harvey-Whipple to supply handles but, because it understood Harvey-Whipple to be "financially unstable", information was requested concerning Harvey-Whipple's "status as related to the R.F.C.", whether, as a result of the RFC releases of funds against shipments, plaintiff could, as Harvey-Whipple claimed, expect to receive payment within 14 days of shipments of handles, and whether DLD would "guarantee payment of invoices which we will submit to Harvey-Whipple Company from time to time."

The following day, February 16, 1955, Harvey-Whipple sent to plaintiff the letter it had requested. The letter described the proposed 14-day procedure of paying invoices, assured that "As a general plan, you can expect payments within the time specified", and stated that "This manner of payment has been and is acceptable to all our other vendors, and we trust that it will also meet with your approval." No reference was made to the outstanding Army notices of default, or the important conference

planned for February 24, 1955 concerning the future of the contracts, or, of course, its past difficulties and failures to adhere to the 14-day plan.

On February 21, 1955, Henrich, DLD's Assistant Chief of Loan Administration, called Walker on the telephone concerning Walker's inquiry letter of February 15, 1955, and it is upon this telephone conversation that plaintiff's case is based. Although the dispute between the parties about this conversation is sharp, it seems plain that at the least Henrich explained the nature of the Harvey-Whipple—Army—RFC relationship, the possibility under the procedures adopted of plaintiff's receiving payment within 14 days of handle shipments, the recent improved delivery performance of Harvey-Whipple which had generated substantial Army payments and RFC loan funds and which, from the data Harvey-Whipple had submitted to RFC, was apparently currently enabling it to defray its obligations to its subcontractors, and finally, the inability of DLD to guarantee to plaintiff the payment of such indebtednesses as Harvey-Whipple might incur for shipments of parts. As seemingly was his custom, Walker requested a letter confirming the conversation, and that same day (February 21, 1955) such a letter was sent by DLD which stated that DLD was "not in position" to guarantee the payment of plaintiff's invoices to Harvey-Whipple, that the Army contract payments were assigned "to this Corporation and payments thereunder are made to us and funds released from time to time under certain conditions to enable borrower to pay the expenses incurred in connection with the contract" and that "The borrower's operations are improving and our loan is being gradually but slowly reduced and we understand that they are meeting their trade obligations on a satisfactory basis in accordance with the arrangements entered into with their creditors."

Plaintiff was sufficiently encouraged by these telephone conversations and letters from Harvey-Whipple and DLD to decide to accept the risk of becoming a Harvey-Whipple subcontractor, and so informed Harvey-Whipple prior to its important February 24 meeting with the Army.

At such meeting, Harvey-Whipple strongly urged that it be permitted to continue under a revised delivery schedule, offering, as consideration, a price reduction for the remaining tools to be delivered and the withdrawal of claims it was making (a general release to be executed with respect thereto). As to its finances, it gave assurances of continued RFC financing if the Army would permit the contracts to continue, pointed to its recent improved delivery performance which was then providing sufficient funds to enable it to pay its subcontractors on a current basis, and announced the obtaining of plaintiff as a new handle supplier, which would correct the troublesome Northern situation and assure an adequate supply of handles. Harvey-Whipple's proposals were accepted at another meeting held on March 9, 1955, embodied in a "Memorandum of Understanding" dated that day, and on or about the following day, plaintiff commenced shipping handles to Harvey-Whipple.

The subsequent events, resulting shortly thereafter in Harvey-Whipple's collapse, are also detailed in *Harvey-Whipple* and *Meriden Industries*. Although for awhile Harvey-Whipple was able to pay plaintiff on the 14-day basis, it soon fell behind on its payments to other subcontractors despite continued shipments of completed tools sufficient to comply with the revised delivery schedule, and the continued receipt, on the above-described basis, of RFC funds. Its contract income, represented by the RFC funds, was simply insufficient to defray its total contract expenses of operation, and since it was losing large sums in its regular heating equipment business, it had no supplementary source of funds. As early as March, it became delinquent on its payments to its heat treater. In June it also began to fall behind in its payments to plaintiff. By July 1, 1955, its indebtedness to plaintiff was almost

$7,000, a good part of which was, on the 14-day basis, delinquent.

In early July, plaintiff and other subcontractors began pressing for payment. Harvey-Whipple attributed its plight to the fact that the funds it was receiving from the DLD were insufficient to permit it to defray its obligations. While this was, as above set forth, quite true literally, it was, not surprisingly, erroneously interpreted by the subcontractors to mean that DLD was either retaining the entire amounts, or unduly large portions, of the Army's remittances, and that the past practice of making substantial releases to Harvey-Whipple was being discontinued. Actually, however, there had been no change in DLD's policy or procedure in this respect. In June it had released to Harvey-Whipple almost $51,000 of some $59,000 received from the Army in respect of Harvey-Whipple's June shipments, and over $25,000 of some $34,000 received from the Army in respect of two shipments made by Harvey-Whipple on July 11, 1955.

On July 15, 1955, Meriden Industries, after being informed by Harvey-Whipple that it was unable to pay Meriden's outstanding invoices, advised that it was suspending manufacturing operations on its components (the pick, hinge and socket) and would make no further shipments. Without these vital components, Harvey-Whipple's contract performance would obviously be crippled.

On July 18, 1955, Walker of plaintiff called DLD's Henrich on the telephone about plaintiff's unpaid bills and inquired as to the reason why, as he understood Harvey-Whipple to have stated, RFC funds were being cut off, but Henrich, after again stating that plaintiff would have to continue to look to Harvey-Whipple and not to the DLD for payment of its invoices, denied that Harvey-Whipple's plight was attributable to any change of procedure or policy by DLD (and promptly called Harvey-Whipple to complain about the erroneous information it was apparently giving its subcontractors). Plaintiff thereafter made no further shipments of handles to Harvey-Whipple on open account.

On July 21, 1955, Walker and three other subcontractors went to the Army Quartermaster's Office in Chicago to discuss their situations and the entire status of the Harvey-Whipple contracts. They advised they would make no further shipments unless their past due bills were paid. However, the problem being essentially a financial one (as of that date Harvey-Whipple was not in default with the Army on its revised delivery schedule), the Army referred the subcontractors to the DLD. Their following telephone call to Henrich to ascertain whether, if they resumed production, DLD would give them assurances of payment, was, however, again unsuccessful, Henrich once more replying that DLD could give no such guarantees to subcontractors.

The following day, July 22, 1955, Harvey-Whipple wrote to plaintiff (as it had promised Henrich it would) "to clarify any possible misunderstanding" concerning the RFC. The letter stated that the deductions made by RFC from the Army payments "have been in strict accordance with a schedule set up by ourselves" and instead now attributed its straightened financial circumstances to price increases in certain components which it had to absorb.

The four subcontractors who had conferred with the Army decided also to confer personally with the DLD in Washington to make certain that DLD understood that they had definitely decided to perform no further subcontract services unless their past due bills were paid in full and satisfactory assurances, in the nature of DLD guarantees, given them concerning their future bills. Such a conference was arranged for July 26, 1955. Although plaintiff could not send a representative to the meeting on such date, nevertheless, to advise DLD that it was in agreement with the subcontractors who would attend, Walker, on July 25, 1955, sent DLD a night letter stating that Tatem concurred "in their feeling regards Harvey-Whipple", that it was

"forced to discontinue our shipments because lack of payment" and that "unless guarantee of payment can be given we will notify Quartermaster accordingly."

On July 26, 1965, Harvey-Whipple conferred with DLD in Washington about its RFC loans, which were then in default, as well as its general situation. Harvey-Whipple stated that, from components on hand, it could assemble and ship 10,000 tools. This shipment would generate sufficient Army funds ($19,430.55) which could be used not only to clear the default (amounting to $5,200) but also still leave for release to Harvey-Whipple $14,230.55. This amount, although far from sufficient to clear up its obligations to its subcontractors, would permit making at least some payments to them and thus possibly induce them to resume production. The DLD officials agreed to go along with this seeming last desperate attempt by Harvey-Whipple to save itself. Harvey-Whipple planned to make the shipment on July 29. The record does not indicate that any of the subcontractors knew of this proposed shipment.

However, later that day (July 26) the subcontractors also had their conference with the DLD officials and made their demands. DLD's meeting such demands would immediately require straight loan funds to pay outstanding Harvey-Whipple debts to the subcontractors as well as a commitment by RFC to make such additional straight loans in the future whenever the past arrangements for releases of funds to Harvey-Whipple proved to be insufficient. In effect, the subcontractors were again seeking, as plaintiff had made plain in its night letter, DLD guarantees of Harvey-Whipple's obligations to them, past and future. The DLD officials rejected these demands and the subcontractors accordingly advised that further performance of their subcontracts was definitely over, a decision which Meriden confirmed by letter to the Army written on July 29 (and which was also confirmed by letters from the Springfield Heat Treating Company, the Blue Ridge Pressure Casting Company (the handle nut supplier) and plaintiff, to the Army and Harvey-Whipple on August 1, 2, and 3, respectively).

This decision by the subcontractors plainly marked the definite end of Harvey-Whipple's contracts and frustrated the principal purpose of Harvey-Whipple's planned 10,000-tool shipment on July 29, 1955, i. e., the use of the amount of approximately $14,000 to make partial payments to the subcontractors to induce them to continue with contract performance. Such partial payments as Harvey-Whipple would be able to make to them on account of their past debts would not satisfy the conditions they had laid down for resumption of subcontract performance. Accordingly, on July 29, 1955, DLD wired Harvey-Whipple that in view of the subcontractors' advice to both the Quartermaster and DLD, DLD would no longer agree to the arrangements made at the Harvey-Whipple July 26 conference. The record does not show whether this telegram was received by Harvey-Whipple prior to the 10,000-tool shipment. However, such shipment was made that day, but, when Harvey, on August 2, 1955, personally presented the $19,430.55 Army payment check to DLD in Washington as well as Harvey-Whipple's request papers for the release of $14,230.55, Henrich advised that, in view of the subcontractors' decision, it had been determined that no further advances would be made to Harvey-Whipple to finance the performance of the contracts which, it was now clear, Harvey-Whipple could no longer fulfill.[4]

Harvey immediately requested a conference with the appropriate DLD officials to review this decision and such a conference was arranged for the following day. Apparently in an attempt to overcome the effect of plaintiff's night letter of July 25, 1955, conditioning future performance upon "guarantee of

---

4. The determination was made by the appropriate Assistant Secretary of the Treasury, the former Administrator of the RFC having become the Assistant Secretary of the Treasury in charge of the liquidation of the RFC.

payment" by DLD of plaintiff's bills, Harvey-Whipple's President, Whipple, who had arrived in Washington for the conference, sought from plaintiff a less adamant communication which could be presented to the forthcoming conference, and that day (August 2, 1955) plaintiff did send to Whipple in Washington a telegram stating it would continue to supply handles "if satisfactory credit arrangements can be made." However, DLD's decision to terminate financing was reaffirmed at the conference the following day. Furthermore, Walker of plaintiff, that same day (August 3, 1955) wrote to Harvey-Whipple that unless it received payment of its past due invoices by August 10, "it will be necessary for us to take appropriate action to collect this account" and that "Only when this account is paid in full will we be able to resume supplying these handles to you subject to revised terms."

The position taken by the subcontractors, followed by the resulting decision by DLD to terminate financing, effectively and finally halted all further contract performance by Harvey-Whipple.

There is still due to plaintiff from Harvey-Whipple the sum of $6,361.53 on unpaid invoices, and when further performance of the contracts ended, plaintiff had an unused inventory purchased solely for the performance of the Harvey-Whipple subcontract upon which it has suffered a net loss of $1,040.22, making a total loss, for which it here seeks compensation, of $7,401.75.

As was the situation in *Meriden Industries,* plaintiff here too relies upon an alleged contract implied in fact which it contends was breached when DLD refused to release to Harvey-Whipple any part of the Army's check in payment of the last 10,000-tool shipment. It says that the statements made by Henrich in his February 21, 1955 telephone conversation with Walker, in response to plaintiff's inquiry letter of February 15, 1955, constituted representations and assurances that the major portion of Harvey-Whipple's invoice amounts would always be released by DLD for the benefit of Harvey-Whipple's subcontractors and suppliers, that such representations were made to induce plaintiff to become a subcontractor, and that, in reliance upon such representations, plaintiff became Harvey-Whipple's handle supplier, purchasing an inventory of raw materials and making shipments of completed handle components. It argues that the payment of the $14,230.55 by DLD to Harvey-Whipple with respect to the July 29, 1955 shipment would have enabled Harvey-Whipple to continue the contracts, pay the subcontractors, and permit the profitable consumption of their inventories purchased for the Harvey-Whipple contracts.

■ These contentions cannot be accepted. For one thing, for Henrich to have committed DLD to make, under any and all circumstances, large releases to Harvey-Whipple from Army payment funds, would have been completely illogical. Surely Walker could not rationally believe that DLD was committing itself in advance to honor Harvey-Whipple's requests for fund releases automatically, without any investigation or discretion upon its part, and irrespective of Harvey-Whipple's situation at the time of the request or of whether the release could serve to advance the primary purpose of the loan, i. e., to enable Harvey-Whipple to complete contract performance. It is hardly likely that any lender administering the type of loan here involved would so commit itself, and it is difficult to believe that Walker, as an experienced businessman, could have believed that DLD was making such a commitment to him.

Secondly, for Henrich to make such a representation would be to give complete misinformation, and therefore to act in an unauthorized manner, a conclusion not lightly to be arrived at. For that was not the way the loan had worked at all during the many months it had been in operation. No loan funds could be released unless Harvey-Whipple's request therefor, backed up by various financial and other data, such as prospective use, contract performance status, in-

ventory data, etc., was duly examined and approved. No such approval could be given (by anyone other than the RFC Board or Administrator or comparable official) if the request indicated such an "adverse change" in Harvey-Whipple's financial picture as to seriously threaten its ability to repay. In the past, RFC had refused to make further loan advances when adverse conditions faced Harvey-Whipple, such as contract defaults and refusals by subcontractors to ship components. Under these circumstances, and even assuming he would have the power to so do, it would have been strange indeed for Henrich, at such late date, to have suddenly committed DLD to a change in its entire policy, procedure, and relations with Harvey-Whipple.

After Harvey-Whipple finally terminated operations at the end of July or in early August 1955, plaintiff, on October 24, 1955, wrote to DLD urging it (1) "to put more money into Harvey-Whipple" so that it could "pay up their subcontractors and guarantee them payments in the future so they can complete the contract", (2) to permit the subcontractors to complete the contract "at a few cents increase" to enable them to recover their unpaid invoices "plus utilizing inventories on hand", or (3) for DLD to pay for the last shipment "with the stipulation that this money be paid to the sub-contractors." There is not a word in this communication about any such Henrich assurances or representations upon which plaintiff now pitches its case for fastening legal liability upon defendant. Nor is there any mention of such commitment in any other contemporaneous communication written by either plaintiff or DLD after the telephone conversation upon which plaintiff relies. DLD's letter to plaintiff written, at plaintiff's request, the very day of the conversation as a confirmation thereof, says nothing about any such commitment. On the other hand, it specifically pointed out that the Army's payments under the contracts "are made to us and funds released from time to time *under certain conditions* to enable borrower to pay the

expenses incurred in connection with the contract." (Italics supplied.)

Walker well knew at the time, through the usual trade channels, that Harvey-Whipple was in poor financial condition. Thus, he knew that the RFC loan under which it had long been operating was not the solution to Harvey-Whipple's financial problems. In recognition of the fact that Walker realized plaintiff would be vulnerable despite the RFC loan to Harvey-Whipple was his consistent attempt from the beginning to obtain a direct DLD guarantee that his bills would be paid, something that Henrich told him immediately (as shown by DLD's letter confirming the February 21 telephone conversation), and consistently thereafter, was not possible.

Recognizing, of course, the possibility that Walker misunderstood the import of what Henrich told him in the telephone conversation in question, it nevertheless seems plain that Henrich simply explained the nature of the RFC loan and the mechanics of its operation. Such an explanation would necessarily have included a description of the system whereby the borrower, Harvey-Whipple, would have to satisfy DLD, by the submission of appropriate requests, that the advance should be made, for that feature was one of the principal aspects of the loan arrangement. If Henrich also told Walker that in the past the bulk of the assigned Army funds were, pursuant to Harvey-Whipple's requests, released to Harvey-Whipple, he was, of course, telling the truth, and it may well have been that Walker became convinced that under the system Henrich described, plaintiff would be justified in assuming the risks involved in becoming a Harvey-Whipple subcontractor. But such statement cannot be converted, as plaintiff is seemingly attempting to do, into a firm commitment of identical action in the future regardless of the circumstances involved.

■ Based upon all the above considerations, it must be concluded that Henrich did not make the representations or give the assurances upon which plaintiff bases its contention that a legal con-

tract implied in fact existed between plaintiff and DLD which DLD breached when it withheld the final Army payment and refused to release any part thereof to Harvey-Whipple.

■ For the same reasons set forth in *Meriden Industries*, the contention, also made here, that DLD's action in retaining the full amount of such final Army payment check was in effect only a contract termination device reflecting the Army's alleged disinterest in further tool production under the contracts, cannot be accepted. In making this contention, plaintiff ignores all the preceding events in July 1955, in which it itself played such an important part and which led up to the DLD decision to cease making further loan advances. For, as a study of the facts placed in proper sequential context clearly demonstrates, it was not DLD's August 2 decision that destroyed further Harvey-Whipple contract performance. It was, instead, the subcontractors' prior concerted action in refusing to perform any further services unless their conditions were met that produced this result. As shown, as early as July 15, 1955, Meriden flatly took the position that it was through with Harvey-Whipple and further contract performance. Plaintiff itself, after having pressed Harvey-Whipple for payment since at least early July, refused to make any further shipments after Walker's telephone conversation of July 18 with Henrich indicated the inaccuracy of Harvey-Whipple's statements concerning DLD financing. On July 21, 1955, Harvey-Whipple's four principal subcontractors, including plaintiff, told the Army in Chicago that no further shipments would be made unless their terms would be met, a position forcefully reiterated by plaintiff in its letter of July 25 to DLD and by the other three subcontractors in their meeting with DLD on July 26. Thus, it was only when DLD became convinced that the subcontractors' position had made further contract performance impossible that it decided to cease any further financing thereof, the entire purpose of the financing being to enable Harvey-Whipple to complete the contracts, a possibility which the subcontractors had frustrated. As pointed out in *Meriden Industries*, plaintiff's and the other subcontractors' positions were wholly understandable. But to blame the cause of Harvey-Whipple's suspension of operations on DLD, when the record shows conclusively that it was instead their own termination actions which in turn caused such suspension (and prevented the further consumption of their own inventories on hand) is simply putting the cart before the horse.

Plaintiff further says that, even if it be concluded that its claim has no legal basis, nevertheless Henrich's alleged statements, which induced plaintiff to become a subcontractor, at least fairly constitute the basis for an "equitable" claim, as such term is used in Congressional Reference cases. Burkhardt v. United States, 84 F.Supp. 553, 113 Ct. Cl. 658 (1949). However, since the conclusion is compelled that Henrich did not make the statements attributed to him, the basis for this contention also falls. A mere description of the nature and mechanics of the RFC loan could not be the basis for any kind of a claim against the Government.

Plaintiff also alludes to alleged statements made by Henrich in the February 21, 1955 telephone conversation that in Henrich's opinion Harvey-Whipple was a good risk and that at that time it was performing satisfactorily on its contract and paying its subcontractors within 14 days. Plaintiff contends that these statements, upon which it relied, also "induced" it to become a subcontractor, and further form the basis for either legal or equitable relief.

Here again, knowing what he did about Harvey-Whipple, it is quite incredible that Henrich or any responsible DLD official would at that time tell anyone that Harvey-Whipple was a good financial risk. Harvey-Whipple was not only insolvent but at that very time was facing formal notices of default that had been issued on its contracts on February 10, 1955. Thus, it was not then known how

much longer Harvey-Whipple would even be permitted to continue with contract performance. It was not until March 9, 1955, when the Army—Harvey-Whipple "Memorandum of Understanding" was executed that it was known what the result would be of the current crisis Harvey-Whipple was facing.

It is true that at that particular time, and while Harvey-Whipple's fate was hanging in the balance, Harvey-Whipple's shipments had taken an encouraging turn for the better, resulting in an increased flow of Army funds to DLD, substantial releases by DLD to Harvey-Whipple, and payments by Harvey-Whipple to its creditors. If Henrich pointed this out, as his confirmatory letter written that same day indicates he did, he was only relating the actual current facts. If plaintiff felt warranted, on such basis, and considering its dire need of new business, in risking Harvey-Whipple's ability to continue that kind of performance, it was a considered business judgment on its part, for it was well acquainted, through trade channels, with Harvey-Whipple's sorry past performance.

Finally, it must here too be pointed out, as it was in *Meriden Industries*, that even if it be assumed that DLD was in some manner, legal or otherwise, obligated to plaintiff to make the $14,230.55 release of funds to Harvey-Whipple against the last tool shipment (a shipment which the record fails to indicate plaintiff even knew was going to be made) there is no way of ascertaining whether plaintiff would have received any benefit from it anyway, or if so, how much of such payment it would have received. As past experience indicated, the receipt by Harvey-Whipple of an RFC fund release was in no manner any guarantee either that any particular subcontractor would receive any part thereof or how much that part would be. These releases were simply not large enough to defray all the debts Harvey-Whipple incurred in the performance of the tool contracts, as plaintiff painfully began to learn in June 1955, and as other subcontractors had long learned through earlier years of contract performance. On July 13, 1955, a time when Harvey-Whipple was intimating that its then straightened circumstances were attributable to DLD, it received from DLD, as a result of two shipments it had made to the Army on July 11, 1955, over $25,000, but plaintiff received no part thereof (nor, apparently, did any of the other subcontractors).

■ As was true in *Meriden Industries*, it is not that the Government has here received the benefit of something for which it has not paid. The full, agreed, contract price for all tools received by it has been paid to Harvey-Whipple. One naturally sympathizes with Harvey-Whipple's creditors. But the Government is not in privity with them, and a detailed study of the record compels the conclusion that nothing happened which would serve to put this particular creditor in such privity with the Government as to cause the Government to be legally liable, or in equity and good conscience, morally obligated, to defray the losses it incurred by deciding to become a subcontractor of Harvey-Whipple. Under the circumstances, any payment to plaintiff would amount to a gratuity.