**In the Matter of Donald L. MOYER and Kenneth W. Hazlett, Individually and Trading as Shenandoah Manufacturing Company, Bankrupts.**

**No. 2076.**

United States District Court,
W. D. Virginia.

Aug. 1, 1960.

Henry H. Whiting, Winchester, Va., for the trustee.

Richard S. Wright, Woodstock, Va., for Lynwood Moyer.

DALTON, Chief Judge.

The matter involved here is a petition for review of an order of the Referee, entered November 19, 1959, disallowing a salary claim of one Lynwood Moyer in the above-styled bankruptcy action.

All of the early hearings were had without a court reporter and no record of these hearings was kept other than by notes of the Referee and the pleadings filed. From the memorandum of law and facts transmitted to this Court by the Referee, from the briefs submitted by counsel for the parties, and from a reading of the record transmitted to this Court, the following facts are disclosed.

The Moyer family consists of Mr. and Mrs. Lynwood Moyer, and their three sons, Donald, Joel and Richard. Joel and Richard organized a general contracting business in June, 1954, in Arlington County, Virginia, trading as Moyer Brothers. Both brothers were apparently attending high school at the time and working after school, on weekends, at night, and on holidays. They moved the business to Warren County, Virginia, in 1956. The majority of their work done here was performed for Shenandoah Manufacturing Company.

Shenandoah Manufacturing Company was a partnership organized in the summer of 1956 by Donald L. Moyer, the third brother, and Kenneth W. Hazlett, a friend of the Moyer family. This company had as its main objective the sub-

division of real estate and the manufacture of pre-cut homes. It seems that the company would supply the lot for the purchaser and the pre-cut materials for the house, or the materials for the house alone and let the purchaser acquire his own site. It does not appear that Shenandoah Manufacturing Company did any of the actual building of the homes. On the other hand, it appears that Moyer Brothers (Joel and Richard) constructed these houses for the purchaser through the Shenandoah Manufacturing Company, or helped these purchasers on specific work, such as masonry.

The Hazlett family apparently supplied capital for the venture. The testimony discloses that Mrs. Hazlett, mother of the partner Kenneth, advanced around $7,000 in the beginning and additional sums later, the total being approximately $8,000 to the partnership; and Kenneth Hazlett "put in a good deal more money than that" in the partnership (I, p. 46). Donald Moyer, the other partner, was the managing partner, but the record indicates that he knew virtually nothing about running the business. The person who apparently controlled and managed the business was the father of Donald Moyer, Lynwood Moyer.

The partnership was thrown into involuntary bankruptcy by the filing, on January 30, 1958, of an involuntary petition in bankruptcy by E. W. Armstrong and other creditors of the company. One proof of claim filed in subsequent proceedings was that of Lynwood Moyer claiming wages of $250 per week due him from Shenandoah Manufacturing Company aggregating $12,000—$3,000 of which he claimed as a priority for wages earned within three months of the filing of the petition. The Referee denied this claim in toto.

The evidence shows the facts leading up to the assertion of this claim of wages to be these:

All of the Moyer men were in the construction or contracting business. The three sons, all in their teens in 1956, and now in their early twenties, seem to have gotten their training and experience for this type of work from their father, Lynwood Moyer. Mr. and Mrs. Moyer in 1956 were living in Arlington, their children in Warren County; Lynwood was in the heating and plumbing business for himself as a small-scale contractor, and filed a petition for bankruptcy in the Alexandria Division of the United States District Court for the Eastern District of Virginia on January 8, 1957.

Between the organization of the Shenandoah Manufacturing Company in the summer of 1956 and January, 1957, when Lynwood went into bankruptcy, Lynwood was living in Arlington, but going to Front Royal on weekends and helping "them get their foundations in". (III, p. 90) It is not clear whether he was helping his son and friend in Shenandoah or his two sons in Moyer Brothers, but since both were working together he might have been helping both. He did assist the partnership of Hazlett and Donald Moyer in their early months, though. He even helped the two men close the deal that brought them their first land for their subdivision. Lynwood Moyer in January, 1957, moved from Arlington to Front Royal and went to work for Shenandoah, taking over all management and administration of the company.

All three parties to this relationship, the two partners and Lynwood, testify that when Lynwood Moyer came to work for the company in January, 1957, that no amount of salary was agreed upon, but that they would decide upon the salary later when they could determine what it was worth.

The issue presented by this petition is whether or not the salary was even later agreed upon. The following conflicting versions of when and what agreement was reached are quoted:

Donald Moyer: (Tr. I, pp 70–71)

"Q. I will ask you, Don, this: Did you employ your father? A. Yes.

"Q. You did? How much did you pay him a week? A. Well, we had agreed on a total sum, and then we figured it come out about $250 or something like that.

"Q. Had you agreed? A. Not previously, no.

"Q. You had not agreed how much you were going to pay him when you hired him, is that right? A. When we hired him?

"Q. Yes. A. No, we'd figure it as we went along, what it was worth. I mean, it was worth a lot more than he was going to get. He is going to get nothing.

"Q. How much did you figure it was worth as you went along? A. Well, we finally ended up figuring about $250.

"Q. A week? A. A week.

"Q. But that was after he finished all the work wasn't it? A. I don't know, Mr. Whiting.

"Q. Hum? A. I don't know whether it was or not after we finished.

"Q. Can't you remember that? A. Mr. Whiting, I am rather confused.

"Q. Donald, don't you remember my examining you and your father before Mr. Moore down there? A. Yes, sir, you got a lot of—you went off on a lot of tangents on things I didn't know about. I tried to tell you then.

"Q. Don't you recall my asking you and your father about the arrangements about the pay, and don't you recall that you all said that you made up your mind after your father had done the work how much you were going to pay him? A. No, I don't know, Mr. Whiting."

Kenneth Hazlett: (Tr. II, pp 169–170)

"Q. What were the arrangements made between the partnership and Mr. Lynwood Moyer for salary? A. We never made any.

"Q. You mean, Mr. Lynwood Moyer was working for free? A. No, sir, he was going to get—we were going to talk about that later.

"Q. You made no agreement at all how to pay him at that time? A. I don't remember any.

"Q. Was Mr. Moyer to share in the profits of the company? A. No, sir.

"Q. I am speaking of Mr. Lynwood Moyer. A. That's right. I understood it that way.

"Q. There was no understanding to that effect? A. No.

"Q. Not even an implied understanding that he was to— A. No, sir.

"Q. In other words, there was no arrangement at all, Mr. Hazlett, with regard to salary and there was no arrangement at all with regard to sharing the future profits of the company? A. That's right."

Lynwood Moyer: (Tr. I, pp 78–79)

"Q. All right, now, then, was there any arrangement at that time about how much they would pay you? A. No, there was a discussion about it, and I told them, "Well, let's wait, see how things go, and we will set a salary at a later date."

"Q. When was the salary finally set? A. I think we talked all along about it there, and then somewhere along about September I think that—

"Q. September of '57 A. I believe so. —that we figured—

"Q. All right, when you discussed the salary, was there any note given you? A. No, sir, I just told them this: I told them that if I worked somewhere else I could get $250 a week, and I thought that I'd be worth that much there and that I thought that from the position that I held, that I know I could make that money at somebody else."

Lynwood Moyer: (Tr. III, pp 90–91)

"Q. In the summer of '56? A. That's right.

"Q. But you weren't the one who supervised the building and did all the supervisory work from the start, though, were you? A. Well, I only came up. I was still living in Arlington at that time, Mr. Whiting. I came up over week-ends and at various times, and helped them get their foundations in.

"Q. Who was doing the buying and supervising the work during that period of time? A. Well,—

"Q. You were not, were you? A. No, sir. I did do this: On Baltimore Lumber Company, I was there the day that they came. I was in on that particular one.

"Q. I want you to tell me now before January of '57—this is correct, is it not, that you didn't do any work of any substantial character for them? A. In '56, that's correct, sir, because I was still living in Arlington.

"Q. What were you doing there? A. Oh, I did a little contract work.

"Q. What salary were you paid for the work you did before January of '57, for the Shenandoah Manufacturing Company? A. Well, I don't think I was paid any salary, that I can remember, for January.

"Q. Before? A. No salary agreement, or anything like that.

"Q. There wasn't any salary agreement subject to January, was there? A. It was a salary agreement after that.

"Q. When? A. In other words, when I went to work for them and moved up here, they agreed to pay me.

"Q. How much? A. That was later on that we decided, $250 a week.

"Q. How much later on was that? A. Well, I don't know just how long after that it was.

"Q. Give us your best recollection. A. Well, my best recollection, I can say, is probably along about April, May.

"Q. April or May of 1958? A. No, sir.

"Q. '57? A. '57.

"Q. All right. Now, you did, however, feel that they owed you something for the work you had done prior to that, didn't you?"

The Referee in bankruptcy, hearing this testimony, observing the demeanor and conduct of these witnesses, concluded that no agreement for salary had been reached.

The scope of review by the District Court of a report by the Referee, according to § 2, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 11, sub. a, is that the "records, findings, and orders" certified to the judge by the referee may be confirmed, modified, reversed, or returned with instructions for further proceedings by the reviewing district judge. But No. 47 of the General Orders in Bankruptcy, 11 U.S.C.A. following section 53, states:

"Unless otherwise directed in the order of reference the report of a referee or of a special master shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous. The judge after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

In the case of In re Bifulci, D.C. S.D.N.Y.1957, 154 F.Supp. 629, 630, District Judge Dawson stated:

"In a proceeeding to review a determination of the Referee the Court should not set aside the findings of fact of the Referee, who saw the witnesses and heard the testimony, unless the findings of fact are clearly erroneous. General Order 47, 11 U.S.C.A., following § 53; 2 Collier on Bankruptcy, par. 39.28."

And District Judge Picard stated in In re Consolidated Oil Company, D.C. E.D.Mich.1956, 140 F.Supp. 614, 616:

"The referee's ruling that Bay Refining Company was an unpaid interim creditor is a finding of fact and as such is not to be disturbed by this court unless clearly erroneous. In re Masor, 7 Cir., 117 F.2d 368; In re Hoffman, D.C., 49 F.Supp. 245. See also In re Newman, 6 Cir., 126 F.2d 336, at page 337, where the court said:

" 'In our circuit, the existing rule is that the District Judge should not disturb the findings of fact of a Referee in Bankrupcty, unless there is most cogent evidence of mistake and miscarriage of justice.'

"The evidence clearly supports the referee's findings and this court will not disturb them."

■■ For Lynwood Moyer to establish a claim for wages amounting to $12,000, he must prove an employment contract, either oral or written, with the partnership. He has attempted to do this through the testimony of himself and the two bankrupts. This oral contract must stand or fall upon the testimony of these witnesses. The Referee heard the evidence presented by these witnesses, and their creditability or demeanor can best be judged by him. He concluded that the facts presented by the witnesses did not establish a contract of employment for $250 per week.

This Court is of the opinion that this phase of the Referee's report was clearly a finding of fact which is substantially supported by the evidence presented, and should not be disturbed.

Where facts are not in dispute and the Referee's order rests upon an inference or deduction drawn from the facts not in conflict, a different situation is present, and thus, there is presented a second problem with which the District Court must deal. There is no conflict in the evidence that Lynwood Moy-er did perform services for the company, for which he has received no remuneration. The Referee found in his order of November 19, 1959, that "any services rendered by the said Lynwood Moyer were purely gratuitous, in order to assist his sons and Mr. Hazlett in making a success of their sub-division", and denied the claim of Lynwood in the entirety. The testimony is not clear, but the Referee's report shows that the bankrupts tried to convey several lots to Lynwood in the dying days of the partnership, but all were returned to the estate by this bankruptcy proceeding. It appears (from a fair interpretation of the evidence) that Lynwood Moyer has worked for Shenandoah Manufacturing Company from January or February, 1957, to January, 1958, without compensation other than household lodging and board supplied Mr. and Mrs. Moyer by the son, Donald.

■ The law is as the Referee stated in his opinion of June 30, 1960:

"The accepted law is that any contracts between members of a family, father and son, or husband and wife, are looked on with suspicion and must be substantiated by definite and positive proof of such negotiations."

In fact, where it is shown that the person rendering services for another is a member of the family of the person served, and receiving support therein, either as parent, child, or other near relative, a presumption arises that such services are gratuitous. Peters v. Altizer, 1944, 127 W.Va. 92, 31 S.E.2d 552. But these services are usually family-type services, support, education, clothes, and even then the presumption may be rebutted by a showing of such facts and circumstances as will merit a finding that the services were intended to be compensated. 17 C.J.S. Contracts § 46.

■■ The testimony of the three key witnesses and other witnesses who had dealings with the partnership show that Lynwood Moyer did perform services of

the type that are normally compensated for, and this Court reaches the conclusion from the evidence that Lynwood Moyer's services were not intended as gratuitous.

"If there is no special agreement as to the amount of compensation and the services are not intended to be gratuitous, the law implies a promise by the employer to pay what services reasonably are worth, which is determined largely by the nature of the work and the customary rate of pay for such work in the community and at the time the work was performed. These are matters for the jury to determine, under proper evidence and instruction. The same rule applies when the contract as made is too indefinite or uncertain to be enforceable." 35 Am.Jur., Master & Servant § 64.

This is the essence of a recovery on the principle of *quantum meruit* for the reasonable value of the services performed. The measure of recovery is the reasonable value of the work and labor performed, less the amount of compensation, whether in money or otherwise, already received.

█ It might be urged that Lynwood Moyer has not asked recovery on *quantum meruit* and this Court should not now make a *quantum meruit* award in the absence of his request for such relief. This Court is of the opinion that the exception filed by Lynwood Moyer, dated December 10, 1959, to the Referee's order is sufficiently broad to cover this relief:

"It is further submitted that the record does not indicate that the services performed by Lynwood Moyer for Shenandoah Manufacturing Company were performed gratuitously, and that *he is entitled to*

*compensation for such services."* (Emphasis added.)

█ It is the opinion of the Court that Lynwood Moyer is entitled to establish a claim for the reasonable value of services performed for the company between February, 1957, and January, 1958. The difficulty is to determine with definiteness the amount which should be allowed on a *quantum meruit* basis.

█ The evidence shows that Mr. Moyer was the general manager of the company, arranging the finances, making loans, seeing that materials were purchased and delivered, and in general, looked after the business. During the time he was working for the company 18 houses were started or completed. Taking into consideration the nature of the work performed by Mr. Moyer, the time of employment involved, and the benefits which the company received from Mr. Moyer's services, the Court feels that the reasonable value of Mr. Lynwood Moyer's services over and above the benefits already received by Mr. Moyer from the partnership is $150 per month for the eight months beginning with February 4, 1957, and ending with October 4, 1957.

For the months of October, November, and December, 1957, the Court feels that the services performed by Mr. Moyer were substantially less than for the other eight months, due to the financial difficulties which the company ran into. The Court finds the reasonable value of his services for these three months to be $100 per month.

The Court, therefore, holds that Lynwood Moyer be allowed a general claim for wages accrued in the amount of $1,200, and further that he be allowed a preferred claim of $300 for wages earned within three months of the filing of the petition in bankruptcy.