Raymond CAMPBELL, d/b/a Ray's Photographic Studio, Plaintiff-Appellee,

v.

TENNESSEE VALLEY AUTHORITY, Defendant-Third Party Plaintiff-Appellant,

v.

Earl DANIEL, Third Party Defendant-Appellee.

No. 27732.

United States Court of Appeals
Fifth Circuit.

Dec. 23, 1969.

Rehearing Denied and Rehearing En Banc Denied Feb. 3, 1970.

294

Robert H. Marquis, Gen. Counsel, Thomas A. Pedersen, Solicitor, H. Peter Claussen, Atty., Tennessee Valley Authority, Div. of Law, Knoxville, Tenn., for appellant.

J. A. Keller, Robert M. Hill, Jr., Florence, Ala., for Raymond Campbell.

E. B. Haltom, Jr., Florence, Ala., for Earl Daniel.

Before RIVES, COLEMAN and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This is an action in *quantum meruit* brought by Raymond Campbell against the Tennessee Valley Authority (hereafter TVA) to recover $30,240 for the microfilming of certain technical trade journals which were a part of TVA's technical library located at Muscle Shoals, Alabama. The District Court entered a judgment upon a verdict for Campbell in the amount of $30,240. We affirm.

Campbell entered into an oral agreement with Earl Daniel, Director of the TVA Technical Library, to reproduce 13 sets of technical trade journals on 16 mm. microfilm at a price of $90 per roll. Mr. Daniel had no authority to make such a purchase for TVA and entered into the agreement with Campbell without the knowledge of his superiors. Campbell photographed, developed and processed 336 rolls of 16 mm. film containing the journals in question, placed the film in cartridges and delivered them to the TVA Technical Library at Muscle Shoals. Under the terms of the oral agreement, the charge for this work was to have been $30,240. The cartridges were placed on the shelves of the library and were available to its patrons for approximately two months.[1] The microfilm cartridges were then returned to Campbell by registered mail along with a letter from Daniel stating that there was no contract for their reproduction, that he had no authority to enter into such a contract, and that the price of the film was excessive. Campbell refused to accept the film and it was returned to the library, where it has since been stored. TVA has refused to pay for the film. The journals reproduced by Campbell were destroyed upon instruction by Daniel.

Campbell's original complaint relied on an express contract with TVA. TVA's motion for summary judgment on the ground that there could be no express contract since its employee Daniel had no authority to enter such a contract was granted. Campbell then amended his complaint to set out a claim for recovery based on *quantum meruit* or a contract implied in law. TVA then moved for and was granted the right to join librarian Daniel (whose employment had since been terminated) as a third-party defendant. Daniel's motion for summary judgment was granted on the ground that he could not be held liable to indemnify TVA in the event that it were held liable to Campbell since for Campbell to recover

---

1. There is evidence in the record that in this two-month period three of the cartridges were each used once.

he had to prove that the microfilm bene-fited TVA in an economic sense and in-demnity by an agent applies only to eco-nomic loss or detriment suffered by his principal.

The principal contention made by ap-pellant TVA is that the District Court committed error in instructing the jury that the measure of damages in this case was "the fair market value of the microfilm that benefited TVA".[2] It is TVA's contention that it "is obligated to pay not for the film itself, but only for the 'benefit', or unjust enrichment, if any, which it received by reason of the *use* it made of the film while it was in the library." The first question thus presented to this Court is whether a per-son who is entitled to recover from an agency of the federal government under a theory of *quantum meruit* is entitled to the reasonable, or fair market, value of the goods or services so provided, or to the reasonable value of the benefit so realized by the Government. In other words, is the measure of recovery to be determined by the amount of money that would be necessary to acquire on the open market the goods or services from which the benefit is derived, or is the measure of recovery how much the benefit has been worth to the person upon whom it was conferred?

In Clark v. United States, 95 U.S. 539, 24 L.Ed. 518 (1877), a steamer was lost while being operated by the Army pursu-ant to an unenforceable parol contract with the owner. The owner sued for the loss and the reasonable value of the use of the vessel for eight days. The Court held that where an unenforceable parol contract with the Government is perform-ed on one side, the party performing will be entitled to "the fair value of his prop-erty or services * * * as upon an im-plied contract for a quantum meruit". 95 U.S. at 542. Since the service sup-plied was the use of the vessel, the Court allowed recovery for the reasonable value of the use as provided for by the parol contract, holding that while the contract price is "not binding or conclusive, it may be regarded as admissible evidence for that purpose." 95 U.S. at 543.

Crocker v. United States, 240 U.S. 74, 36 S.Ct. 245, 60 L.Ed. 533 (1916), in-volved a contract to furnish letter car-riers' satchels to the Post Office De-partment which was rescinded by the Government for fraud. The Court held that although there could be no recovery upon contract, there was no obstacle to recovery upon a theory of *quantum vale-bant*, the measure of recovery being the "value of the satchels furnished". 240 U.S. at 82, 36 S.Ct. 245. The Court went

---

2. The portions of the District Court's in-structions to the jury dealing with the question of the measure of damages are as follows:

Another authority has said "The ob-ligee shall be compensated, not for any loss or damage suffered by him, but for the benefit which he has conferred upon the obligor." Appendix 390.

\* \* \* \* \*

"In valuing the benefits or loss to TVA, you must use fair market value. In other words, you must use the val-ues that the same or similar microfilm and the journals would sell for on the open market." Appendix 393.

\* \* \* \* \*

\* \* \* If the TVA had agreed to pur-chase, we will say, a typewriter—they used the expression bulldozer—and they used the typewriter and sent it back, under the authorities the plaintiff would

be entitled to recover only the value of the use of the typewriter, because the typewriter could be sold to somebody else. \* \* \* There would be a market value for the typewriter \* \* \* But if something is designed for a person to use for a particular thing, and they accept it, and it has no market value other than that particular use, you could see that it would be a complete loss. Those are the two extremes that you might visualize. You have here certain microfilm that were (sic) made. What would be the value of these microfilm if they could be sold to somebody else? \* \* \*
Appendix 395.
Also, the following special interrogatory was given:

"C. What is the fair market value of the microfilm that benefited TVA?" Appendix 394.

on to hold that since the contract was tainted with fraud, it could not be looked to as an admission of value.

In Blake Construction Co. v. United States, 1961, 111 U.S.App.D.C. 271, 296 F.2d 393, an action by the United States against government contractors and their surety to recover amounts allegedly found owing after the renegotiation of a contract, the Court (per Burger, J.) said: "If in fact the contract was made without authority, then perhaps no contract exists, but the contractor is nonetheless entitled to the reasonable value of the benefits conferred". 296 F.2d at 396.

In Williams v. United States, 1955, 127 F.Supp. 617, 130 Ct.Cl. 435, a contractor paved roads on a military installation pursuant to an oral agreement with an officer who lacked actual authority to enter such a contract. The Court held that under these facts there arose an implied contract under which the United States was obligated to pay the value of the services rendered. 127 F.Supp. at 623.

■ Under these cases it would appear that the measure of recovery in an action in *quantum meruit,* or an action on a contract implied in law, is the reasonable value of the goods or services furnished to the benefited defendant. However, the proper measure of recovery was at issue in none of the above cases and the cases which directly consider the question are in conflict.

In re Moyer, W.D.Virginia 1960, 190 F.Supp. 867, 873, held that "the measure of recovery * * * on the principle of *quantum meruit* * * * is the reasonable value of the work performed, less the amount of compensation, whether in money or otherwise, already received". Evans v. Mason, 82 Ariz. 40, 308 P.2d 245, 65 A.L.R.2d 936 (1957), an action in *quantum meruit* to recover for services rendered to decedent pursuant to a parol contract barred by the Statute of Frauds held that the measure of damages is the actual value of the services rendered to the decedent. On the other hand, Hill v. Waxberg (9 Cir. 1956) 237 F.2d 936, 16 Alaska 477, an action by a contractor to recover for services and expenditures made in contemplation of a proposed building contract, held the "restitution is properly limited to the value of the benefit which was acquired". At 939.

This confusion in the cases is clarified by a statement made in a footnote of the Court's decision in Martin v. Campanaro (2 Cir., 1946), 156 F.2d 127, 130 n. 5, cert. den. 329 U.S. 759, 67 S.Ct. 112, 91 L.Ed. 654:

> The claimants are entitled to recover on a quantum meruit basis. But "quantum meruit" is ambiguous; it may mean (1) that there is a contract "implied in fact" to pay the reasonable value of the services, or (2) that, to prevent unjust enrichment, the claimant may recover on a quasi contract (an "as if" contract) for that reasonable value. It has been suggested that the latter is a rule-of-thumb measure of damages adopted in quasi contract cases where the actual unjust enrichment or benefit to the defendant is too difficult to prove; see Costigan, Implied-In-Fact Contracts, 33 Harv.Law Rev. (1920) 376, 387.

■ In the present situation the District Court was correct in using the "rule of thumb" measure of damages and in instructing the jury that the measure of damages was "the fair market value of the microfilm that benefited TVA," instead of instructing that the measure of damages was the reasonable value of the benefit realized by TVA from the microfilm, since the actual benefit to TVA would not have been susceptible of proof. The value realized by a library in having a particular reference work available to its patrons cannot be adequately expressed in dollars and cents. The real benefit is realized, not so much by the library itself, as by those who depend upon the library in their research activities, and the benefit is not so much that the books, technical journals and other research sources are actually *used,* on a regular basis, but that they are conveniently *available for use.* If use, rather than availability, were the only

test of the benefit conferred by a book in a library, a good university library could be many times smaller than the present day standard and still retain its effectiveness as a center for research.

Furthermore, in view of the fact that the microfilmed technical journals furnished by Campbell had no readily marketable value to anyone except the TVA because of their unique character and the special circumstances[3] of this case, the District Court properly instructed the jury that the measure of recovery was the fair market value, even though the microfilm was available on the library's shelves for only two months.

Appellant TVA next contends that the District Court erred in not granting its motion for a new trial under Rule 59(a), Federal Rules of Civil Procedure, on the grounds that the verdict is contrary to the law and the evidence. TVA argues that if the jury could find that the "fair market value of the microfilm that benefited TVA" could be the contract price between the parties, it could not exceed the lowest contract price that would have been obtainable had competitive bidding taken place on the microfilming under 16 U.S.C., Sec. 831h(b) (1964),[4] and that the evidence is uncontradicted that University Microfilming, a division of Xerox Corporation, would have done the microfilming for $10,000. Thus, TVA contends that Campbell could recover no more than $10,000 and that his recovery of $30,240 was contrary to the law and the evidence.

■ While there is authority for the proposition that the upper limit of recovery in an action of this nature is the amount agreed to by the parties in the unenforceable contract, Hill v. Waxberg, supra, 237 F.2d at 940, n. 6, the testimony of Holladay, the representative from the University Microfilm division of Xerox, that his company would have done the microfilming here in question for $10,000 did not constitute a bid under 16 U.S.C., Sec. 831h(b), and thus can in no way be considered an upper limit on Campbell's recovery.[5] It is also hornbook law that the jury is in no way bound by the testimony of experts. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 727, 88 L.Ed. 967 (1944), reh. den. 322 U.S. 767, 64 S.Ct. 941, 88 L.Ed. 1593.

■ Appellant TVA contends that the District Court erred in overruling its objections to the testimony of plaintiff Campbell to the effect that he borrowed a substantial amount from a local bank to finance the microfilming work for TVA and as to Campbell's dealings with librarian Daniel. This contention is without merit. The testimony was proper to show Campbell's good faith and the apparent authority of librarian Daniel in their dealings and assisted the jury in understanding the case in its proper context. It was in no way calculated to arouse sympathy, prejudice, or bias in favor of the plaintiff.

■ Finally, TVA contends that the District Court erred in granting summary judgment on its third-party complaint against Daniel. TVA relies on the proposition that "wherever an agent violates his duties or obligations to his principal, whether it be by exceeding his authority, or by positive misconduct, or by mere negligence or omission in the proper functions of his agency, or in any

---

3. The journals which had been reproduced had been destroyed, making the microfilm copies the only ones available. Moreover, there was evidence that the journals in question were a necessary part of a technical library. Likewise, it does not appear the microfilm copies had value to anyone other than to the library.

4. Section 831h(b) requires that:
   "All purchases and contracts for supplies and services, except for personal services,

made by [TVA] shall be made after advertising, in such manner and at such times sufficiently in advance of opening bids, as the Board shall determine to be adequate to insure notice and opportunity for competition" * * *

5. Holladay testified that he had not seen where the journals had been stored at the library nor investigated what the microfilming of them would entail in any specific manner. Appendix 180.

other manner, and any loss or damage thereby falls on his principal, he is responsible therefor, and bound to make a full indemnity." Story on Agency, Sec. 217c (9th ed.). See Restatement (Second) of Agency, Sec. 400 (1958). "However, the basic fact of legal significance charging the Government with liability in these situations is its *retention of benefits* in the form of goods or services." Prestex, Inc. v. United States, 1963, 320 F.2d 367, at 373, 162 Ct.Cl. 620. (Emphasis added). In other words, the Government's liability is predicated, not on a loss by the plaintiff for which it owes compensation, but on a benefit it has received and retained for which it owes restitution. The point is that the TVA has not suffered a loss or been damaged as a result of Daniel's unauthorized dealings, but has received a benefit for which, in justice, it must pay restitution. In this same spirit, it would be inequitable to allow TVA to retain the benefits it realized from Daniel's unauthorized dealings and then require Daniel to answer in indemnity for TVA's liability in restitution to Campbell.

The judgment of the District Court is Affirmed.

RIVES, Circuit Judge (dissenting):

With deference, I submit that the district judge inadvertently imported into the claimed quasi contract, "implied in law," too much of the actual agreement between the appellee Campbell and Daniel, the *unauthorized* agent of TVA. Campbell concedes, as he must, that only a quasi contract is now involved.[1]

Under the facts and circumstances of this case, I would hold that TVA is not liable to Campbell in any amount. If mistaken in that view, I would nonetheless hold that the extent of its liability is measured by the benefit it received from the limited use made of the film during the two months it remained in the TVA Technical Library.

This litigation began with the filing of a complaint which alleged that Earl Daniel, as agent of the TVA, acting within the line and scope of his authority, agreed with Campbell for him to produce and deliver microfilm of certain trade journals for which Campbell was to be paid $90.00 per roll; that TVA ordered 336 rolls, all of which were delivered; but that TVA refused to pay to Campbell the agreed amount of the contract, $30,240.00 (App. 1–3). The district court (Judge Seybourn Lynne) granted TVA's motion for summary judgment as to that claim.[2]

Campbell then amended his complaint by filing counts in general assumpsit seeking to recover a quantum meruit.[3]

1. "As stated above, Appellee admits that this action was based solely on an *implied contract* and it was only upon this action in *quantum meruit* that Appellee presented its claim to the jury." (Appellee's Brief, p. 14.)

"In the case at bar there was never any issue whatsoever during the trial by counsel, or the court other than the issue presented under a contract 'implied in law' or 'quantum meruit.'" (Appellee's Brief, p. 17.)

2. "IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that defendant's motion for summary judgment is hereby granted with respect to the alleged contract claim and the action is dismissed as to that claim." (App. 29.)

3. "AMENDMENT
"Comes now the plaintiff in the above captioned cause and amends his complaint by adding the following:
SECOND CAUSE OF ACTION
COUNT 2
"The Plaintiff expressly adopts the allegations of Paragraph 1 of Count 1.
"The plaintiff claims of the defendant $30,240.00 due from it for merchandise, goods and chattel sold by the plaintiff to the defendant from the first day of January, 1967 through the 13th day of February, 1967, which sum of money with the interest thereon is still unpaid.
COUNT 3
"The Plaintiff claims of the defendant $30,240.00 due from it for work and labor done for the defendant by the plaintiff from the first day of January, 1967 through the 13th day of February, 1967, which sum of money with the interest thereon is still unpaid. Plaintiff expressly adopts the allegations of paragraph 1 of Count 1 of the bill of complaint." (App. 30.)

While the amended complaint (n. 3, *supra*) is broad enough to sustain recovery on a contract implied *in fact*, as well as on one implied *in law*, I repeat that the sole claim is on a contract implied *in law* (see n. 1, *supra*). Judge Grooms correctly so charged the jury:

"Members of the jury, this case began as a contract case, but it was determined at the outset that Mr. Earl Daniel had no authority to make a contract; the contract was void for that reason, and the contract aspect went out and then the complaint was amended to claim for work and labor and for goods and chattels, merchandise, goods and chattels sold to the defendant, T.V.A. on the theory of what we know as a quantum meruit. That is an old form of action, and it literally means as much as he deserves. Quantum means quantity, merit [sic], as much as he deserves. The case has proceeded since then on the theory of quantum meruit.

\* \* \* \* \* \*

"As I stated to you the words quantum meruit, liberally [sic] translated, means as much as he deserves. The basis of a recovery under a quantum meruit is that the defendant has received a benefit from the plaintiff which it is unjust for him to retain without paying for it. Quantum meruit is a devise to prevent unjust enrichment by requiring a recipient of work or services to pay the party furnishing such work and services as much as he reasonably deserves for this work." (App. 387, 388, 389.) [4]

I.  TVA Is Not Liable to Campbell in Any Amount.

It is now conceded that Daniel had no authority from TVA to enter into any contract with Campbell. Under section 9(b) of the TVA Act,[5] according to the affidavit of Raymond L. Forshay, Director of the Division of Purchasing of TVA, "For TVA to enter into such a contract it would have been necessary for the Division of Purchasing to advertise the contract and award it under competitive bidding." Mr. Forshay deposed further that "The microfilming did not fall within any of the exceptions to the advertising requirement contained in section 9(b) of the TVA Act. \* \* \* The Division of Purchasing did not authorize Mr. Earl Daniel, or anyone else, to contract for the microfilming here in question." (App. 8.) There is no evidence to the contrary.

It is further established without dispute that no authorized agent of TVA accepted delivery of the rolls of microfilm. Campbell testified:

"Q.  Mr. Campbell, who do you contend accepted this film at TVA when you delivered it, Mr. Daniel?

"A.  I contend that the Technical Library accepted it because their representative—

"Q.  What employee accepted the film, Mr. Aldridge?

"A.  Jim Aldridge received it, and he stated to me and to Mr. Edwards, the President of the Shoals National Bank he was instructed by his superior to inspect them and accept them.

"Q.  In other words, you say Aldridge accepted it acting under Daniel's instructions?

"A.  And Daniel is TVA, as far as I am concerned." (App. 143.)

4. This part of Judge Grooms' charge to the jury is in accord with the recognized distinction between a promise "implied in fact" and one "implied in law." 1 Williston on Contracts, 3rd ed. § 3A; 17 Am. Jur. 2nd Contracts, § 3; 1 Corbin on Contracts §§ 17 and 19.

5. "(b) All purchases and contracts for supplies or services, except for personal services, made by the Corporation, shall be made after advertising, in such manner and at such times sufficiently in advance of opening bids, as the Board shall determine to be adequate to insure notice and opportunity for competition: *Provided, That advertisement shall not be required when* \* \* \*." 16 U.S.C.A. § 831h(b).

Of course Campbell cannot lift himself by his own bootstraps in any such manner, for it is self-evident both that Daniel had no authority himself to purchase the microfilm and that he had no power to delegate to Aldridge authority to accept the film. Mr. Forshay testified positively and without contradiction:

"Q. Did Mr. Aldridge have the authority to accept materials on behalf of TVA?

\* \* \* \* \* \*

"A. Mr. Aldridge did not have the authority to accept these materials. We have provisions within our regulations for the acceptance of materials, and Mr. Aldridge did not have that authority." (App. 379.)

It is thus clear beyond question that no TVA employee having authority to do so either ordered or accepted this microfilm. That was the basis on which Judge Lynne granted TVA's motion for summary judgment and dismissed the original complaint for breach of express contract of purchase.

The jury verdict of $30,240.00 is in the exact amount the plaintiff Campbell claimed that Daniel promised for TVA to pay for the film (336 rolls at $90.00 per roll). A reading of the record makes obvious, I submit, that the unauthorized express contract has simply been enforced under the guise of a quasi contract or quantum meruit. That would be all right if the jury were permitted to be swayed by the hardship Campbell would suffer if he could not collect for the microfilm. Long ago the Supreme Court, speaking through Mr. Justice Frankfurther, warned against such consideration of hardship:

"The case no doubt presents phases of hardship. We take for granted that, on the basis of what they were told by the Corporation's local agent, the respondents reasonably believed that their entire crop was covered by petitioner's insurance. And so we assume that recovery could be had against a private insurance company. But the Corporation is not a private insurance company. It is too late in the day to urge that the Government is just another private litigant, for purposes of charging it with liability, whenever it takes over a business theretofore conducted by private enterprise or engages in competition with private ventures. Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it. The Government may carry on its operations through conventional executive agencies or through corporate forms especially created for defined ends. See Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 390 [59 S.Ct. 516, 518, 83 L.Ed. 784]. Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority. See, e. g., Utah Power & Light Co. v. United States, 243 U.S. 389, 409 [37 S.Ct. 387, 391, 61 L.Ed. 791]; United States v. Stewart, 311 U.S. 60, 70 [61 S.Ct. 102, 108, 85 L.Ed. 40], and see, generally, The Floyd Acceptances, 7 Wall. 666 [19 L.Ed. 169]." (Footnote omitted.)

Federal Crop Ins. Corp. v. Merrill, 1947, 332 U.S. 380, 383–384, 68 S.Ct. 1, 2–3, 92 L.Ed. 10, 175 A.L.R. 1075.

Much the same thought was expressed for the D.C. Circuit by its then Judge Burger, now the Chief Justice:

"In dealings with the government, unlike those with private parties, one is charged with knowledge of the extent of the actual authority of the gov-

ernment's contracting agent since no agent of the government can hold out to have any authority not sanctioned by law. However difficult the process may be, his actual authority can be ascertained. National Electronic Labs., Inc. v. United States, Ct.Cl. 1960, 180 F.Supp. 337, 341–342. The size and complexity of government makes this rule necessary, and the public nature of the instruments such as statutes, executive orders and regulations granting and limiting authority makes it the only feasible. rule."

Blake Construction Company v. United States, 1961, 111 U.S.App.D.C. 271, 296 F.2d 393, 396.

The "only feasible rule," to use Judge Burger's expression, necessary to retain the benefits of competitive bidding [6] is to charge private parties with knowledge of the extent of the actual authority of the govenment's contracting agent.

Robert Holladay, Manager of the Microfilm Office at Xerox University Microfilm, "the largest supplier of microfilm outside of the federal government" (App. 151), testified that his company would have duplicated Campbell's work for $10,000.00 (a little less than one-third of Campbell's charge), and in addition would have returned the original journals to TVA,[7] whereas Campbell, at Daniel's direction, destroyed them.[8]

It is now clear beyond the shadow of a doubt that no TVA employee with proper authority had either ordered or accepted this microfilm, and hence that there was no valid contract between TVA and Campbell. However, when goods or services are furnished to the federal government pursuant to an unenforceable or invalid contract, the courts will, in certain limited fact situations, grant relief of a quasi-contractual nature. Such relief is appropriate only when it serves to prevent the government from being unjustly enriched at the expense of another. That much is demonstrated by the decisions and opinions, as recently recognized by the Supreme Court in a note:

"The respondent also contends that even if the contract is not enforceable, a recovery *quantum valebat* should be decreed. However, such a remedy is appropriate only where one party to a transaction has received and retained tangible benefits from the other party. See Crocker v. United States, 240 U.S. 74, 81–82 [36 S.Ct. 245, 248, 60 L.Ed. 533]. Since the Government has received nothing from the respondent, no recovery *quantum valebat* is in order."

United States v. Mississippi Valley Generating Co., 1961, 364 U.S. 520, 566 n. 22, 81 S.Ct. 294, 318, 5 L.Ed.2d 268.

In the *Crocker* case cited in the note just quoted, Mr. Justice Van Devanter, speaking for the Court, said:

"It [the corrupt arrangement] was made by Lorenz and Crawford while endeavoring to secure the contract for the company and was a means to that end. They were the company's agents and were securing the contract at its request. It accepted the fruits of their efforts and thereby sanctioned what they did, and made their knowledge its own. * * *

"It results that no recovery could be had upon the contract with the Postmaster General, because it was tainted with fraud and rescinded by him on that ground. But this was not an obstacle to a recovery upon a *quantum valebat*."

---

6. See n. 5, *supra*.

7. I agree with the majority that the jury was not bound by Holladay's estimate. Nonetheless, it must be remembered that one of the purposes of competitive bidding is to avoid the uncertainty of conflicting testimony and inferences *after the event* and to secure to the purchaser the advantage of the lowest *actual bid*. That advantage assured by Congress (see n. 5, *supra*) is now denied to TVA.

8. In the course of the microfilming, the original journals were cut up and photographed (App. 74). After the microfilm rolls had been delivered to the TVA Technical Library, the original journals were destroyed by Campbell at the direction of Daniel (App. 122).

240 U.S. at 81, 36 S.Ct. at 248. Continuing, the Court held that no recovery could be had upon a quantum valebat because there was lacking the requisite proof of the value of the letter carriers' satchels so furnished and retained. The claimant's insistence in *Crocker*, was remarkably similar to that of Campbell in the present case. As stated by Mr. Justice Van Devanter for the Court:

"He [the claimant] insists, however, that the findings show the price at which the government contracted to take the satchels with the shoulder straps, and also what it cost the government to supply the straps, and that the difference should be regarded, in the absence of other evidence, as representing the value of the satchels as furnished,—that is, without the straps. The insistence proceeds upon the theory that the contract price was in the nature of an admission by the government of the value of the satchels with the straps. However this might be in other circumstances, it is wholly inadmissible here, for the fraud with which the contract was tainted completely discredited the contract price, and prevented it from being treated as an admission of the value by the government. It therefore was incumbent upon the claimant to show the value by other evidence, and, as this was not done, no recovery could be had upon a *quantum valebat*."

240 U.S. at 82, 36 S.Ct. at 248.

Thus, it would seem that the *possible* basis for recovery considered in *Crocker* was a contract implied *in fact*, rather than *in law*, because the Government actually accepted and permanently retained the satchels and, hence, was contractually liable for their value. In the present case, as has been shown, no TVA

employee with proper authority accepted the microfilm, and TVA made every reasonable effort to return the rolls to Campbell. Upon Campbell's refusal to accept delivery of the film, it was stored and its use forbidden (App. 350).[9]

In Clark v. United States, 1877, 95 U.S. 539, 24 L.Ed. 518, the claimant Clark and Major Potter in the Quartermaster's Department entered into an oral agreement with the approval of General Steele that the Quartermaster's Department should pay Clark $150.00 a day for the use of the steamer "Belle." The time of use was not agreed on until she made a trial trip from Brownsville, Texas, to Ringgold Barracks and return to prove her ability to perform the service for which the Quartermaster's Department needed a steamer. If she made a satisfactory trial trip, the parties were then to enter into a formal written contract for her future use at the same price per day. At the same time it was agreed orally that the Quartermaster's Department was to run the "Belle" on her trial trip at government expense, and that if she were lost on her trial trip, the government should pay for her whatever three disinterested men should estimate her value to be. After eight days of the trial trip, the "Belle" was wrecked and proved a total loss. Three disinterested persons were then agreed upon and requested by Major Potter and Clark to appraise the value of the vessel. By written award they found her value to be $60,000.00. Clark also proved by evidence other than the award that $60,000.00 was the reasonable value of the vessel. The government declined to pay because an Act of June 2, 1862, 12 Stat. 411, required, among other safeguards, that every such contract be reduced to writing and signed by the contracting

---

9. In forbidding use of the film, TVA may have gone further than law and equity required in view of the fact that Campbell had destroyed TVA's original journals. See n. 8, *supra*.

It should be noted that in *Crocker* the contract price of the satchels was inadmissible to prove value because the contract was tainted with fraud. While there was no fraud in the present case, there was a complete absence of competitive bidding necessary to establish a valid contract price. See n. 5, *supra*. Let me divert to express my opinion that the price agreed on between Daniel and Campbell is wholly inadmissible to prove the value of the film.

parties. The Supreme Court held the oral contract void. Continuing, the Court said:

> "We do not mean to say that, where a parol contract has been wholly or partially executed and performed on one side, the party performing will not be entitled to recover the fair value of his property or services. On the contrary, we think that he will be entitled to recover such value as upon an implied contract for a *quantum meruit*. \* \* \* The special contract being void, the claimant is thrown back upon the rights which result from the implied contract. This will cast the loss of the vessel upon him.
> \* \* \*
>
> \* \* \* \* \* \*
>
> "The stipulation in this case, as appears by the findings, was for $150 per day. This would make the amount of the claim $1,200. For this amount the claimant is entitled to a decree."

95 U.S. at 542, 543, 24 L.Ed. 518.

There the government got the use of the vessel for eight days, and Clark was entitled to recover in quantum meruit upon a contract implied *in fact*, rather than upon a claimed quasi contract. The decision furnishes no authority for holding the government liable in the case at bar upon a quasi contract, implied *in law*.[10]

In Blake Construction Co. v. United States, 1961, 111 U.S.App.D.C. 271, 296 F.2d 393, Blake and the General Services Administration contracted for the renovation of a portion of a public building. A letter of understanding stated that the contemplated contract "will include a clause providing for renegotiation at completion of the work." A further letter of the same date stated the proposal and incorporated provisions of government standard forms that the contract would be subject to renegotiation. The formal written contract stated a lump sum price for the work, but did not include any provision for renegotiation. Upon completion of the work, the government proposed an audit of Blake's accounts pursuant to renegotiation. Blake stood on the fact that his contract contained no provision for renegotiation, but he nonetheless allowed the audit to proceed. The contracting officer ruled that Blake had been overpaid $57,281.10. Blake contested this determination both administratively and judicially on the ground that the contract was not subject to renegotiation. The district court granted summary judgment against Blake. The D.C. Circuit, speaking through Judge Burger, held summary judgment not the appropriate remedy but remanded the case to the district court for further proceedings to determine whether the government could make out a case for reformation of the contract so as to include the renegotiation provision.

Thus *Blake* involved the reformation vel non of an express contract. The only part of the opinion bearing upon an implied contract was in answer to the government's position that the omission of the renegotiation provision from the formal contract rendered that contract void.

> "If in fact the contract was made without authority, then perhaps no contract exists, but the contractor is nonetheless entitled to the reasonable value of the benefits conferred. 38 Decs.Comp.Gen. 38 (1958). The record does not reveal that such a computation would result in the precise amount determined by the contracting officer pursuant to the renegotiation provision which he believed to be a part of the contract. Hence, the judgment cannot be affirmed on that ground."

---

10. On the other hand, it furnishes strong authority for the proposition presently to be discussed that *if* the government is liable in any amount, the extent of its liability is not the agreed purchase price, but is measured by the limited use made of the microfilm during the two months that it remained in TVA's Technical Library.

296 F.2d at 396. No party to this case denies that principle of law.

In Prestex, Inc. v. United States, 1963, 320 F.2d 367, 162 Ct.Cl. 620, the government contracting officer advertised for bids on white duck cloth of certain specifications to be used in making summer uniforms for the cadets of the United States Military Academy. Prestex submitted its bid with an attached sample which appeared to meet the specifications, but which, as a later laboratory test showed, was in material variance. Prestex was awarded the contract and had the 25,000 yards of cloth manufactured. The government, after testing a sample of the finished cloth, refused to accept delivery. The Court of Claims held that the award was illegal and granted the government's motion for summary judgment. Clearly, that decision does not support the majority ruling. The opinion does, however, contain an admirable statement of the principles of equity and justice which call for "relief of a quasi-contractual nature * * * in certain limited fact situations." (Emphasis supplied.)

> "Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it. In certain limited fact situations, therefore, the courts will grant relief of a quasi-contractual nature when the Government elects to rescind an invalid contract. No one would deny that ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason. However, the basic fact of legal significance charg-

ing the Government with liability in these situations is its retention of benefits in the form of goods or services." (Footnotes omitted.)

320 F.2d at 373.

In Williams v. United States, 1955, 127 F.Supp. 617, 130 Ct.Cl. 435, it was held that the contracting officer had ratified the agreement in question and that the government had received the benefits of its performance. The *Williams* case involved a contract implied *in fact*. Indeed it has been held that the Court of Claims has no jurisdiction of an action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied *in law*.[11]

The underlying principle is that of forbidding unjust enrichment. "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." A.L.I. Restatement, Restitution § 1, p. 12.

Chapter 2 of that text "states the conditions under which there is a right to restitution because of a mistake in the conferring of a benefit." A.L.I. Restatement, Restitution Introductory Note, p. 26. Such a right may arise in the case of a person who has paid money (Id. § 16) or transferred property (Id. § 39), or rendered services (Id. § 40) to another which have inured to the latter's benefit, in the mistaken belief that he is performing a valid contract with the other, although the contract is later avoided. A right to restitution, however, does not arise in such cases unless the recipient of the property or services is *unjustly enriched*.

> "Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it. The

11. Merritt v. United States, 1925, 267 U.S. 338, 341, 45 S.Ct. 278, 69 L.Ed. 643; J. C. Pitman & Sons, Inc. v. United States, 1963, 317 F.2d 366, 368 n. 4, 161 Ct.Cl. 701; Tatem Mfg. Co. v. United States, 1967, 386 F.2d 898, 899 n. 1, 181 Ct.Cl. 496.

mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor."

A.L.I. Restatement, Restitution p. 13.

Under the facts and circumstances of this case, it is doubtful whether TVA was *enriched* or *harmed* by Campbell's services when consideration is given to the fact that Campbell destroyed TVA's original journals. See n. 7, *supra*. Shirley Nichols, now TVA's librarian, testified:

"Q. How about the ability to get to either one of the materials, say the materials on microfilm as opposed to going through the hard cover? Which is faster?

"A. Going to the hard cover is much more satisfactory.

"Q. It is faster and more satisfactory for the person in pure research?

"A. Yes. (App. 347.)

\*   \*   \*   \*   \*   \*

"Q. As a librarian, do you personally prefer microfilm or hard copy?

"A. Hard copy." (App. 355.)

Assuming arguendo that TVA was benefited by Campbell's services, it was not *unjustly* enriched: It has been demonstrated that no authorized agent of TVA accepted delivery of the rolls of microfilm; that TVA has not wrongfully retained the microfilm, but has made every reasonable effort to return it to Campbell, and that upon Campbell's refusal to accept the film, TVA has stored it and forbidden its use. The only possible benefit retained by TVA is in the two-month period that the microfilm remained in its Technical Library. In that two months, three of the rolls were each used once (see n. 1 to majority opinion). There was no evidence that the person making such limited use of the film knew or had reason

to know that he was using film which did not belong to TVA or that he was in any way obligating TVA to pay for the film. Such knowledge is, I submit, necessary for this limited user to impose upon TVA a duty of restitution. See A.L.I. Restatement, Restitution §§ 40 and 41. Further, a precedent should not be laid for the public policy requirement of competitive bidding (see n. 5, *supra*) to be frustrated by the application of some principle of restitution or quasi contract. For all of the foregoing reasons, I am firmly of the opinion that TVA is not liable to Campbell in any amount.

II.  *If* Liable, What Is the Extent of TVA's Liability.

The majority holding is expressed at p. 297.

" \*   \*   \* in view of the fact that the microfilmed technical journals furnished by Campbell had no readily marketable value to anyone except the TVA because of their unique character and the special circumstances of this case, the District Court properly instructed the jury that the measure of recovery was the fair market value, even though the microfilm was available on the library's shelves for only two months.[3]

"3. The journals which had been reproduced had been destroyed, making the microfilm copies the only ones available. Moreover, there was evidence that the journals in question were a necessary part of a technical library. Likewise, it does not appear the microfilm copies had value to anyone other than to the library."

I do not agree. It is incomprehensible to me that Campbell should be rewarded for *his* destruction (see n. 1, *supra*) of TVA's original trade journals. Perhaps the best precedent is the classic case of the son who murdered his father and mother, but was granted mercy because he was an orphan.

The majority holding measures the extent of TVA's liability by Campbell's loss. That overlooks the fundamental

reason for granting restitution or quantum meruit relief, *viz.*, to avoid unjust enrichment. Ordinarily in such cases the benefit to the one and the loss to the other are co-extensive. However, when the benefit is less than the loss, the recovery is limited to the benefit.[12] As admirably expressed by Professor Williston:

"The only ground, on which a plaintiff, who resorts to a recovery under the principle of Hayward v. Leonard [7 Pick. (Mass.) 181, 19 Am.Dec. 268]; is entitled to recover anything is, that, though so far as his contract rights are concerned, he is entirely out of court, yet it is not fair that the defendant should go out of the transaction as a whole with a profit at his, the plaintiffs, expense * * *."

5 Williston on Contracts, Rev.Ed., § 1482, p. 4141. Williston continues on the same page with an extensive quotation from Hayward v. Leonard, *supra:*

" 'His sole claim to be paid anything is that if he is not paid, the defendant will profit at his expense. Until he has proved that the defendant will in that case profit at his expense, he has not made out a *prima facie* case to be paid anything, and until he has proved how much that profit will be, his *prima facie* case is not complete. When the fact appears in evidence that the work for which money is sought was done under a special contract, and that the plaintiff cannot recover under the special contract, but still seeks a recovery, there is no question of the value of his work and materials, proved in the usual way, and he does not make out a *prima facie* case by proving their value according to regular rules; to make out a case for recovery for such work and materials so furnished, he must prove how much the result of his work have benefited the defendant * *.' "

Recognizing the minuscule benefit of the one time use of each of three rolls of the film during the two-month period that the rolls remained in TVA's Technical Library, the majority seeks to justify the $30,240.00 recovery by holding that TVA's "real benefit" came from the fact that the film was "conveniently *available for use*":

"The real benefit is realized, not so much by the library itself, as by those who depend upon the library in their research activities, and the benefit is not so much that the books, technical journals and other research sources are actually *used* on a regular basis, but that they are conveniently *available for use*. If use, rather than availability, were the only test of the benefit conferred by a book in a library, a good university library could be many times smaller than the present day standard and still retain its effectiveness as a center for research."

There are several answers to that position, two of which have been mentioned earlier in this over-lengthy dissent: (1) the rolls of film were never accepted by any authorized agent of TVA; and (2) no potential user of the film knew or had reason to know that he would be using film which did not belong to TVA, or that by such use he would be obligating TVA to pay for the film. Indeed the very existence of the possibilities mentioned in (2) (the last part of the preceding sentence) would be sufficient to make the film *not* truly *"available for use."* In addition, it should be noted that no publicity was given to the fact that these rolls of microfilm were in the library, and of course they were not "available for use" until potential users knew of their existence. Even the librarian herself testified:

"Q. Now, Mrs. Nichols, were you aware of these microfilm that Ray Campbell did? Were you aware of the fact that they were placed in the library?

12. A.L.I. Restatement, Restitution § 1, Comment e, p. 14.

"A. After a period of time, I was. At the time they were coming in, I did not know they were coming in. (App. 339.)

"Q. Then you knew they were there if you used them, didn't you?

"A. I did after a while. At the time they were delivered, I did not know they were there.

"Q. You are saying something came into the library that you didn't know about immediately?

"A. Yes.

"Q. But you learned it later?

"A. Yes." (App. 350–51.)

This dissent is already much too long. While I am tempted to continue, let me bring it to a close by simply referring to Part I of this dissenting opinion, most of the rationale of which is also applicable to this Part II.[13]

I respectfully dissent.

## ON PETITION FOR REHEARING AND PETITION FOR RE-HEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is Denied.

RIVES, Circuit Judge:

I concur as to the denial of rehearing en banc but dissent as to denial of rehearing by the original panel.

13. See particularly footnotes 9 and 10, *supra*.
   If by some seemingly remote chance this dissent should ultimately be sustained by this Court or by the Supreme Court, I may be pardoned in expressing the hope that some method may be found by which section 9B of the TVA Act, 16 U.S.C. 831h(b), will not prevent TVA from acquiring the nine rolls of film, since the film must have some value to TVA but is worthless to Campbell.